IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| VINCENT MILANO, on behalf of himself and all others similarly situated, | § § § § | |
| Plaintiffs, | § § § | Civil Action No. 3:02-CV-1269-D (Consolidated with Civil Action No. 3:02-CV-1300-D |
| VS. | § § | Civil Action No. 3:02-CV-1533-D Civil Action No. 3:03-CV-0031-D |
| PEROT SYSTEMS CORP., | § § | Civil Action No. 3:03-CV-0032-D Civil Action No. 3:03-CC-0033-D |
| Defendant. | § § § | Civil Action No. 3:03-CV-0356-D and Civil Action No. 3:03-CV-0357-D) |

MEMORANDUM OPINION
AND ORDER

In these consolidated securities fraud actions, the court must decide whether plaintiffs have adequately alleged that defendant Perot Systems Corporation ("Perot") made materially misleading statements or omissions in Securities and Exchange Commission ("SEC") filings, have sufficiently pleaded that Perot had a duty under SEC Rules and Regulations to disclose other omitted information, or have pleaded a strong inference that Perot acted with scienter, as required by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78u-4 and 78u-5, and Fed. R. Civ. P. 9(b). Concluding that they have not, the court grants Perot's motion to dismiss and dismisses these cases with prejudice.

I

These are eight consolidated lawsuits that constitute a putative class action against Perot. Plaintiffs' suits arise from the Registration Statement that Perot filed in connection with its February 2, 1999 initial public offering ("IPO") of common stock and from SEC Form 10-K filings made during the ensuing three-year period. The putative class consists of "all persons who purchased, converted, exchanged or otherwise acquired the common stock of [Perot] between February 2, 1999 and June 6, 2002, inclusive . . . and were damaged thereby . . . . Excluded from the Class are defendant, and officers, directors and employees of defendant[ ]." Compl. ¶ 21.[1] The class period is thus February 2, 1999 through June 6, 2002.

In general terms, plaintiffs allege that Perot, through its officers and directors, made false or misleading statements when it touted its purported upright character from the time of its IPO throughout the class period. In five documents filed with the SEC—the February 1, 1999 Registration Statement, March 22, 1999 Form 10-K, March 3, 2000 Form 10-K, March 8, 2001 Form 10-K, and March 8, 2002 Form 10-K[2]—Perot failed to disclose the existence of

_____

[1]Citations in this memorandum opinion and order to the "Compl." are to plaintiffs' second consolidated amended class action complaint ("complaint"), filed December 20, 2004.

[2]The complaint also mentions other documents—including various Forms 10-Q and a March 22, 1999 letter sent by Perot Chairman H. Ross Perot, Sr. to Perot shareholders—that allegedly

a line of business to market illegal "gaming" services.  Plaintiffs
assert that Perot's omission of these facts rendered misleading its
statements that Perot hires individuals with "strong character."[3]
For example, Perot's March 23, 1999 Form 10-K stated:

> A key part of the Company's business strategy
> is the hiring, training, and retention of
> highly motivated personnel with strong
> character and leadership traits.  The Company
> believes that employing associates with such
> traits is and will continue to be an integral
> factor in differentiating the Company from its
> competitors in the information technology
> industry.

*Id.* at ¶ 43(a).  Perot's 2000, 2001, and 2002 Forms 10-K also
contained substantially equivalent statements.

Plaintiffs aver that, in constructing California's energy
system following deregulation, the California Independent System
Operator ("ISO") retained Perot in early 1997 for a very sensitive
assignment as consultant to develop protocols and systems to create
California's system for pricing, trading, and supplying energy.

---

tout the upright character of Perot employees.  These documents,
however, are not among those that plaintiffs specifically allege
give rise to their securities fraud claim.  The court will thus
consider them only as part of the overall "strong character" theme
that Perot allegedly promoted rather than as independent predicates
for the claim.

[3]In their complaint, plaintiffs address the concept of
"integrity" as well as "strong character." *See, e.g.,* Compl. ¶ 38.
Because the concepts are substantially related and are not treated
in the complaint as being materially distinct, the court will refer
throughout this memorandum opinion and order to plaintiffs' "strong
character" allegations without also explicitly mentioning the
included notion of "integrity."

Perot employee Dr. Paul Gribik ("Dr. Gribik") had unique access to and knowledge of ISO's protocols and implementing software. Beginning no later than May 1997, Perot engaged in an aggressive sales effort to market its consulting services to the persons who would deal with ISO and the systems that Perot was developing for ISO. Perot marketed its services to utilities——including Southern California Edison ("SCE") in May 1997, Pacific Gas & Electric ("PGE") in August 1997, and San Diego Gas & Electric ("SDGE") in October 1997——as well as to energy traders and other companies. Perot told prospective clients that they could gain an "inside edge" by leveraging Perot's unique knowledge of the new system that it was developing in helping ISO create California's energy system. It proposed gaming transactions that would enable them to create price increases or congestion in the California energy market. Perot's sales team included Dr. Gribik, Perot Vice President Ed Smith ("Smith"), and, working on Perot's behalf, George Backus ("Backus"), a paid consultant. After ISO's President learned of Perot's marketing proposals,[4] he sent Perot Vice President H. Ronald Nash ("Nash") an October 22, 1997 letter accusing Perot of breaching its contract with ISO and demanding that Perot cease

---

[4]According to the complaint, Dr. Gribik and Backus made a presentation to SDGE in October 1997, during which they proposed illegal gaming of ISO so as to increase prices and emphasized that non-public information that Perot had obtained from ISO could help SDGE. In attendance was an SDGE Vice President who was also a member of ISO's Board of Governors. After the meeting, he called ISO's President to complain about the presentation.

marketing gaming proposals.

Perot also proposed gaming transactions "[d]uring at least early 1997-late 1998 and perhaps continuing as late as summer 2000." *Id.* at ¶ 52. During 1997 to 1998, Perot offered its gaming services to SCE, PGE, Enron, Reliant Energy ("Reliant"), PacifiCorp, and BPA.

In 1998 Perot made sales presentations to Reliant and Enron. In an April 8, 1998 letter, Smith told an Enron Vice President that Enron could play "gaps" in the protocols to take advantage of self-created congestion.

In 2000 Perot made proposals and offered its gaming services to SCE, Reliant, Duke Energy, Dynergy, and Sempra Energy. In September or October 2000, as a result of Perot's offering its marketing gaming services to SCE, Perot was barred from its consultant office at SCE.

On June 5, 2002 California State Senator Joseph Dunn ("Senator Dunn") revealed that Perot had made sales presentations to traders in California electricity that included unlawful "gaming" transactions that allowed them to manipulate and "self-create" increases in energy prices. Senator Dunn characterized Perot's conduct as the "pinnacle of a conflict of interest" because, while acting as consultant to ISO in constructing California's energy system, Perot proposed to, and taught, others how to "game" the system. *Id.* at ¶ 8. Perot made statements in SEC filings that

were rendered misleading by its failure to disclose the fact that it had proposed the unlawful "gaming" transactions.  After Senator Dunn's revelations, Perot made certain material disclosures between June 7 and July 11, 2002 regarding the marketing of services to California energy companies.

The day before Senator Dunn's announcement, Perot stock closed at $17.98.  On June 6, 2002, the final day of the class period, it closed at $12.90.  On July 11, 2002, during the period that Perot made material disclosures regarding its marketing proposals, the stock reached an intra-day low of $9.99.  Since the end of the class period, the stock price has not recovered to its price prior to Senator Dunn's announcement on June 5, 2002.  On July 21, 2003, when plaintiffs filed their consolidated amended class action complaint ("amended complaint"), the stock closed at $10.73 per share, 40% below its June 4, 2002 closing.

This is the second time these cases has been before the court on a motion to dismiss.  In its prior opinion, *see Milano v. Perot Systems Corp.*, 2004 WL 2360031 (N.D. Tex. Oct. 19, 2004) (Fitzwater, J.) ("*Milano I*"), the court considered a motion addressed to plaintiffs' amended complaint.  It dismissed with prejudice as time-barred plaintiffs' first and third claims brought under § 11 of the Securities Act of 1933 ("the Securities Act"), 15

U.S.C. § 77k.[5]   The court dismissed their second claim brought under § 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (2005), on the ground that plaintiffs had failed adequately to plead a strong inference of scienter, but it granted them leave to replead that cause of action.[6]  Plaintiffs have filed a second consolidated amended class action complaint ("complaint"),[7] and Perot moves anew to dismiss.

_____

[5]Plaintiffs continue in their current complaint to allege the dismissed claims brought under § 11 of the Securities Act to preserve what they maintain is error in the court's decision in *Milano I* to dismiss them.  Both sides recognize that this is plaintiffs' purpose, and neither addresses the merits of these claims in the instant motions to dismiss.  *See* D. Feb. 25, 2005 Br. at 1 n.1; Ps. Apr. 29, 2005 Br. at 1 n.1.

[6]The court did not reach Perot's other arguments, also addressed to the § 10(b)/Rule 10b-5 claim, that plaintiffs had failed to plead false or misleading statements with the particularity required by Rule 9(b) and the PSLRA, that the information allegedly withheld from securities purchasers was not material, and that Perot had no duty to disclose the information allegedly withheld.

[7]Plaintiffs filed on May 12, 2005 a statement clarifying certain insider selling allegations contained in ¶¶ 1 and 95 of the complaint.  The statement abandons certain allegations and contains representations concerning amendments that plaintiffs would make if the court dismisses the cases without prejudice but grants leave to amend (allegations of insider trading by Perot Vice President and Chief Financial Officer Terry Ashwill and Perot Vice President, General Counsel, and Secretary Peter Altabef).  In addressing the legal sufficiency of the complaint, the court has disregarded the parts that have been withdrawn by the clarifying statement.  The court declines to consider the allegations that plaintiffs would add if granted leave to amend, because they are based on publicly available SEC filings that, in the exercise of reasonable diligence, plaintiffs could have included in their current complaint or an earlier version.

- 7 -

In two motions, Perot maintains that plaintiffs' § 10(b)/Rule 10b-5 claim must be dismissed under Rules 12(b)(6) and 9(b) because plaintiffs have failed adequately to plead facts giving rise to a strong inference of scienter and to plead with the particularity required by Rule 9(b) and the PSLRA.  Perot also posits that the federal securities laws did not require that it disclose any of the omitted facts alleged, and that plaintiffs have failed adequately to allege loss causation.[8]  Plaintiffs oppose the motions.[9]

II

Section 10(b) of the Exchange Act makes it "unlawful for any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security . . . , any

---

[8]Perot filed its first motion on February 25, 2005 and its second motion—which addresses only the issue of loss causation—on June 29, 2005.  Briefing on the second motion concluded on September 9, 2005.

Perot also filed on June 29, 2005 a motion that requests that the court to take judicial notice of certain documents included as exhibits in its February 25, 2005 appendix of exhibits filed in support of its first motion to dismiss and certain documents included as exhibits in its June 29, 2005 supplemental appendix of exhibits filed in support of its second motion to dismiss.  Because the court has not considered these documents in granting defendants' February 25, 2005 motion to dismiss, it denies the judicial notice motion without prejudice as moot.

[9]Plaintiffs request in their opposition brief that the court lift the discovery stay imposed by the PSLRA because Perot relies on extrinsic evidence to refute the credibility and accuracy of the allegations of the complaint.  They maintain that if the court considers Perot's submissions without enabling plaintiffs to test their veracity, they will be unduly prejudiced.  Because the court has not relied on any of these materials in reaching today's decision, it denies the request as moot.

- 8 -

manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). SEC Rule 10b-5 makes it

> unlawful for any person, directly or indirectly, . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5(b).

> In order to state a claim under section 10(b) of the [Exchange] Act and Rule 10b-5, a plaintiff must allege, in connection with the purchase or sale of securities, "(1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused [the plaintiffs'] injury."

*Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406-07 (5th Cir. 2001) (second alteration in original) (quoting *Tuchman v. DSC Commnc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994)).

Plaintiffs who sue under § 10(b) and Rule 10b-5 must satisfy the enhanced pleading requirements imposed by the PSLRA[10] and Rule

---

[10]The PSLRA provides that a complaint that alleges a material misstatement or omission under § 10(b) and Rule 10b-5 must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

9(b).[11]   *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir.

2005).  To comply with the PSLRA and Rule 9(b), the complaint must

> (1) specify . . . each statement alleged to have been misleading, i.e., contended to be fraudulent; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representations; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

*Goldstein v. MCI WorldCom*, 340 F.3d 238, 245 (5th Cir. 2003)

(quoting *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336,

350 (5th Cir. 2002)).  "Additionally, . . . for allegations made on

information and belief, the plaintiff[s] must:  . . . state with

particularity all facts on which that belief is formed, i.e., set

forth a factual basis for such belief." *ABC Arbitrage*, 291 F.3d at

350.  Allegations "not based on [p]laintiffs' personal knowledge

. . . are . . . necessarily pleaded on 'information and belief,'

[even if] not labeled as such."  *Id.* at 351.

    In deciding Perot's motion to dismiss, the court "accept[s]

the facts alleged in the plaintiffs' complaint as true and

constru[es] their allegations in the light most favorable to them."

*Goldstein*, 340 F.3d at 244 (citing *Abrams v. Baker Hughes Inc*., 292

F.3d 424, 430 (5th Cir. 2002)).  The court does not, however,

---

[11]Rule 9(b) provides, in relevant part, that "[i]n all averments of fraud . . . , the circumstances constituting fraud . . . shall be stated with particularity."

"strain to find inferences favorable to the plaintiffs." *Id.*
(quoting *Westfall v. Miller*, 77 F.3d 868, 870 (5th Cir. 1996)).
"Nor [does the court] accept conclusory allegations, unwarranted
deductions or legal conclusions." *Southland Sec. Corp. v. INSpire
Ins. Solutions Inc.*, 365 F.3d 353, 361 (5th Cir. 2004) (citing
*Nathenson*, 267 F.3d at 406).

### III

Perot maintains that plaintiffs have failed adequately to
allege materially misleading statements or omissions in Perot's
Registration Statement and Forms 10-K.  The court must decide
whether Perot's statements about its employees' "strong character"
were rendered materially misleading by its non-disclosure of the
purportedly omitted facts alleged in ¶ 9 of the complaint.

### A

Materiality is a required element of a claim under § 10(b) and
Rule 10b-5. *See R2 Invs.*, 401 F.3d at 641.  Although "'materiality
is a mixed question of law and fact . . . usually left for the
jury' . . . , a court can determine statements to be immaterial as
a matter of law on a motion to dismiss." *ABC Arbitrage*, 291 F.3d
at 359 (quoting *United States v. Peterson*, 101 F.3d 375, 380 (5th
Cir. 1996)).  "A fact is material if there is 'a substantial
likelihood that, under all the circumstances, the omitted fact
would have assumed actual significance in the deliberations of the
reasonable shareholder.'" *Southland*, 365 F.3d at 362 (quoting

- 11 -

*Grigsby v. CMI Corp.*, 765 F.2d 1369, 1373 (9th Cir. 1985)).
"Materiality 'depends on the significance the reasonable investor
would place on the withheld or misrepresented information.'" *Id.*
(quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988)).
"Materiality is not judged in the abstract, but in light of the
surrounding circumstances." *Rosenzweig v. Azurix Corp.*, 332 F.3d
854, 866 (5th Cir. 2003) (quoting *Krim v. BancTexas Group, Inc.*,
989 F.2d 1435, 1448 (5th Cir. 1993)).

B

The complaint alleges in ¶ 9 that Perot failed to disclose the
following: that (1) it "had a line of business or a portion of a
line of business in which [it] proposed unlawful 'gaming'
transactions to energy and utility companies," Compl. ¶ 9(a); (2)
in pursuing this line of business, it used "non-public information
that [it] had learned and was learning while it consulted for
[ISO]," *id.* at ¶ 9(b); (3) "[ISO] made a formal written complaint
to [Perot] that this conduct constituted a breach of [Perot's]
contract with [ISO] as well as a breach of ethics," *id.* at ¶ 9(c);
(4) "[a]fter [Perot] told [ISO] that [it] would change its sales
presentations and behave ethically, [it] then continued its line of
business in which [it] proposed unlawful gaming transactions" based
on "'non-public' information," *id.* at ¶ 9(d); and (5) Perot's
conduct exposed it to the material risks of losing or impairing its
critical "'strong character' perception," incurring civil liability

and loss, higher legal expenses from federal or state legislative regulatory and/or criminal investigations, and "all other risks applicable to any company operating in an ethics-sensitive, character-is-destiny business (like consulting) that develops a track record of proposing unlawful transactions or unethically using non-public information to obtain business," *id.* at ¶ 9(e).

Plaintiffs allege that the foregoing facts were omitted from Perot's February 1, 1999 IPO Registration Statement and the Forms 10-K for 1999 through 2002. They assert that Perot was required to disclose these facts because omitting them rendered misleading its statements about the character of its employees. As noted *supra* at § I, the Forms 10-K at issue referred to Perot's business strategy of hiring, training, and retaining "highly motivated personnel with strong character and leadership traits" and stated the belief that this hiring practice was and would continue to be "an integral factor in differentiating [Perot] from its competitors in the information technology industry." *See, e.g., id.* at ¶ 43. The complaint avers that these "representations and the other circumstances surrounding [Perot's] original offer and the subsequent trading of [its] stock until June 5, 2002 caused the market to perceive that [Perot] had 'strong character.'" *Id.* at ¶ 45. It alleges that the disclosure of the omitted facts "caused a rapid, 40-plus percent decline in the price of [Perot's] stock," from which it "has still not recovered." *Id.* at ¶ 82.

- 13 -

C

Plaintiffs argue that the decline in Perot's stock price after disclosure of the omitted facts precludes the conclusion that the omissions were immaterial.  Quoting *Nathenson*, Perot asserts that "[i]n the context of an 'efficient' market, the concept of materiality translates into information that alters the price of the firm's stock."  Ps. Br. 30 (quoting *Nathenson*, 267 F.3d at 415).  Although this is an accurate quotation from *Nathenson*, plaintiffs' suggestion that this is the rule in the Fifth Circuit is misplaced.  *Nathenson* quoted this passage from *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1425 (3d Cir. 1997), in discussing the Third Circuit's approach to materiality in a fraud-on-the-market case.  The Third Circuit has adopted "a rule . . . that, 'when a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock.'"  *ABC Arbitrage*, 291 F.3d at 361 (quoting *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000)).  *Nathenson* agreed with the Third Circuit's *Burlington* decision "in cases depending on the fraud-on-the-market theory, that the complained of misrepresentation or omission have actually affected the market price of the stock."  *Nathenson*, 267 F.3d at 415.  But it "conclude[d] that it is more appropriate in such cases to relate this requirement to reliance rather than to materiality."

- 14 -

*Id.* While the reliance element is subjective, relating to the actual effect of the misrepresentation on a plaintiff, materiality is an objective evaluation in which the court considers the effect of the misrepresentation on the "reasonable" investor or shareholder. *See Southland*, 365 F.3d at 362 ("Materiality 'depends on the significance the *reasonable investor* would place on the withheld or misrepresented information.'" (emphasis added) (quoting *Basic*, 485 U.S. at 240)). So far as this court can determine, the Fifth Circuit has never held that a drop in stock price necessarily reflects the significance that a reasonable investor would have attached to the information, thereby making the decline in price sufficient of itself to demonstrate materiality. *See ABC Arbitrage*, 291 F.3d at 361-62.

D

1

Perot asserts that its generalized statements about seeking to hire employees with "strong character" are neither material nor actionable as a matter of law. Certain broad, generalized statements that constitute mere "puffery" are inactionable under § 10(b) and Rule 10b-5. *See Plotkin v. IP Axess Inc.*, 407 F.3d 690, 698 (5th Cir. 2005); *Southland*, 365 F.3d at 372; *Nathenson*, 267 F.3d at 419; *accord In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570-71 (6th Cir. 2004); *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (per curiam). Statements "are

non-actionable puffery [if] they are 'of the vague and optimistic type that cannot support a securities fraud action . . . and contain no concrete factual or material misrepresentation.'" *Southland*, 365 F.3d at 372 (ellipsis in original) (quoting *Lain v. Evans*, 123 F. Supp. 2d 344, 348 (N.D. Tex. 2002) (Sanders, J.)). "Such statements are either mere corporate puffery or hyperbole that a reasonable investor would not view as significantly changing the general gist of available information, and thus, are not material, even if they were misleading." *In re Ford Motor Co.*, 381 F.3d at 570.

> Courts everywhere have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace——loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.

*Id.* at 570-71 (internal quotation omitted) (citing, *inter alia*, *Nathenson*, 267 F.3d at 404, 419).

For example, in *Nathenson* the plaintiffs alleged that the defendant drug manufacturer violated § 10(b) and Rule 10b-5 by, *inter alia*, representing that the results of a new drug's clinical trial were generally positive and by describing the drug as "a 'fast-acting,' 'improved formulation,'" while failing to disclose that the clinical trial's methodology was flawed. *Nathenson*, 267

F.3d at 419.  The *Nathenson* panel concluded that these statements were "nothing more than inactionable 'puffing,'" constituting "optimistic generalizations, and therefore [could not] support the plaintiffs' claim." *Id.*  And in *Southland* the plaintiffs alleged that a defendant made material misrepresentations when it "made generally positive statements about demand for [its] products and services." *Southland*, 365 F.3d at 371.  The court concluded that these statements were not material, but they were "non-actionable puffery." *Id.* at 372.  Similarly, the Sixth Circuit concluded that the defendant's general statements about quality——e.g., that it "has made 'quality a top priority'"——were inactionable puffery, even if misleading.  *In re Ford Motor Co.*, 381 F.3d at 570.

In contrast, in *Plotkin* the plaintiffs alleged that the defendants violated § 10(b) and Rule 10b-5 by, *inter alia*, falsely announcing that the defendant company had entered into a contract "call[ing] for an annual commitment of $25 million dollars of net purchases," when the purchaser was "actually a very small company with reported [annual] revenues of $7 million" and filed for bankruptcy only eight months later.  *Plotkin*, 407 F.3d at 697-98.  The defendants asserted, and the *Plotkin* panel agreed as a general proposition, "that generalized, positive statements about a company's prospects are not actionable under federal securities law." *Id.* at 698.  But the panel declined to apply this principle to "the announcement of signed, allegedly lucrative contracts,"

- 17 -

which was "a statement of fact, not a generalized positive statement." *Id.*

2

Plaintiffs contend that Perot misled investors when it made statements about the "strong character" of its employees but did not disclose the purported omitted facts alleged in ¶ 9 of the complaint.   The complaint alleges that Perot "repeatedly represented that it employed people of 'strong character' and integrity as a premise for its growth strategy," Compl. ¶ 103, and that Perot's statements "caused the market to perceive that [Perot] had 'strong character,'" *id.* at ¶ 45.   Although plaintiffs attempt to characterize Perot's statements as positive representations of the "strong character" of all its employees, what Perot actually said in its Registration Statement and Forms 10-K was more general. Perot merely represented in these documents that part of its strategy was to hire, train, and retain employees who were "highly motivated," had "strong character," and possessed "leadership traits." *E.g.*, *id.* at ¶ 43(a).[12]

Perot's statements, when viewed in context, are as a matter of

_____

[12]The court assesses whether plaintiffs have adequately pleaded that the statements were misleading based on what Perot actually said in its SEC filings, not on inaccurate descriptions of its statements.   Cf. *Melder v. Morris*, 27 F.3d 1097, 1100 (5th Cir. 1994) ("As an initial matter, the plaintiffs fail to base their allegations on statements *actually* made by URCARCO, opting instead to selectively distort the company's public statements to create an inference of fraud.").

law too general to be material.  The reasonable investor would have relied on objective facts in determining the value of Perot's stock; Perot's generalized statements regarding the hiring of quality employees would not have been significant.  *See Southland*, 365 F.3d at 372 ("Because analysts 'rely on facts in determining the value of a security,' these statements 'are certainly not specific enough to perpetrate a fraud on the market.'" (quoting *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993)).  Nor is it important that Perot stated that it regarded hiring and retaining employees with strong character as a "key strategy." *Cf. In re Ford Motor Co.*, 381 F.3d at 570 (holding that statement regarding making "quality a *top priority*" was immaterial puffery and thus inactionable (emphasis added)).  Perot's general statements about character, combined with its omission of facts about its purported line of business, could not have *materially* misled the reasonable investor about the character of Perot's employees.

Plaintiffs' claim under § 10(b) of the Exchange Act and Rule 10b-5 must be dismissed in part because they have failed adequately to plead that Perot made any material misstatements or omissions.[13]

---

[13]At oral argument, plaintiffs' counsel contended that plaintiffs also rely for their § 10b/Rule 10b-5 claim on stand-alone material omissions that do not depend on Perot's statements about hiring highly motivated personnel with strong character and leadership traits.  In other words, plaintiffs maintain that even had Perot not made such statements, there are omissions that are sufficient of themselves to support a claim for securities fraud.

IV

Perot contends that plaintiffs have failed adequately to plead facts that give rise to a strong inference of scienter. It maintains, in pertinent part, that plaintiffs have failed to plead facts that support a strong inference that it acted with severe recklessness and that the complaint's allegations of motive fail to give rise to a strong inference of scienter.

A

"[T]o survive a motion to dismiss a securities-fraud action, plaintiffs must, *inter alia,* plead specific facts establishing a strong inference of scienter." *Fin. Acquisition Partners L.P. v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006) (citing *Nathenson*, 267 F.3d at 407). "The PSLRA pleading standard for scienter is especially challenging for plaintiffs." *Plotkin*, 407 F.3d at 696-97. "For PSLRA purposes, plaintiffs may establish scienter by demonstrating either intent or severe recklessness." *Fin. Acquisition Partners*, 440 F.3d at 287 (emphasis omitted); *see Southland*, 365 F.3d at 365 ("[T]he PSLRA state of mind requirement is severe recklessness or actual knowledge.").

---

The court has carefully canvassed the complaint and determined that the only alleged omissions that could support such an independent claim are the ones based on SEC Rules and Regulations that the court addresses *infra* at § V. There the court concludes that plaintiffs' reliance on the omissions is insufficient for other reasons. Therefore, the court's reasoning in § III, combined with its conclusions in § V, warrants dismissal of these actions without deciding the cases based on scienter.

> A plaintiff can plead scienter by identifying circumstances that indicate conscious behavior on the part of the defendant, though the strength of the circumstantial allegations must be correspondingly greater. Conscious behavior is a more stringent standard. Conscious behavior, of course, means conscious *mis*behavior. To allege scienter based on conscious conduct, a plaintiff must plead strong circumstantial evidence of misbehavior.

*Mortensen v. AmeriCredit Corp.*, 123 F.Supp.2d 1018, 1025 (N.D. Tex.) (Fitzwater, J.) (citations, internal quotation marks, and brackets omitted), *aff'd*, 240 F.3d 1073 (5th Cir. 2000) (per curiam).

Severe recklessness is

> limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Nathenson*, 267 F.3d at 408 (internal quotation marks omitted) (quoting *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. Apr. 1981) (en banc)).

"Appropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter," *id.* at 412, but "allegations of motive and opportunity, without more, will *not* fulfill the pleading requirements of the PSLRA," *Goldstein*, 340 F.3d at 246 (citing *Nathenson*, 267 F.3d at 412).

"Circumstantial evidence can support a scienter inference."

- 21 -

*Fin. Acquisition Partners*, 440 F.3d at 287 (citing *Nathenson*, 267 F.3d at 408).   The court "consider[s] all the facts and circumstances alleged to determine whether they, in toto, raise a requisite strong inference of scienter." *Goldstein*, 340 F.3d at 246 (citing *Abrams*, 292 F.3d at 430; *Nathenson*, 267 F.3d at 410). It "consider[s] any evidence of scienter pleaded by the plaintiffs cumulatively." *Id.* at 247.

"The PSLRA . . . requires that the complaint 'with respect to *each* act or omission alleged' to be false or misleading 'state with *particularity facts* giving rise to a *strong* inference that *the defendant* acted with the required state of mind." *Southland*, 365 F.3d at 363 (quoting 15 U.S.C. § 78u-4(b)(2)).   Regarding Perot's liability under § 10(b) of the Exchange Act and Rule 10b-5 as a corporate defendant,

> [f]or purposes of determining whether a statement made by the corporation was made by it with the requisite Rule 10(b) scienter we believe it appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment. This is consistent with the general common law rule that where, as in fraud, an essentially subjective state of mind is an element of a cause of action also involving some sort of conduct, such as a misrepresentation, the required state of mind must actually exist in the individual making (or being a cause of the making of) the misrepresentation, and may not

- 22 -

> simply be imputed to that individual on
> general principles of agency.

*Southland*, 365 F.3d at 366 (citations and footnotes omitted). In

other words,

> [u]nder *Southland* to determine whether a
> statement made by [Perot] was made with
> scienter, the court looks to the state of mind
> of the individual corporate official or
> officials who made or issued the statement, or
> ordered or approved it or its making or
> issuance, or who furnished information or
> language for inclusion therein, or the like.

*Fener v. Belo Corp.*, No. 3:04-CV-1836-D, slip op. at 15, 2006 WL

_____, at *___ (N.D. Tex. Mar. 30, 2006) (Fitzwater, J.)

(citing *Southland*, 365 F.3d at 366).

    "[G]roup pleading . . . is *not* permitted for PSLRA actions in

our circuit." *Fin. Acquisition Partners*, 440 F.3d at 285; *see*

*Coates v. Heartland Wireless Commnc'ns, Inc.*, 26 F.Supp.2d 910,

915-17 (N.D. Tex. 1998) (Fitzwater, J.) (rejecting group pleading

after enactment of PSLRA).

> In its traditional meaning, the term
> "group pleading" refers to a doctrine that
> allows plaintiffs to rely on a presumption
> that statements in prospectuses, registration
> statements, annual reports, press releases, or
> other group-published information are the
> collective work of those individuals with
> direct involvement in the everyday business of
> the company. In its original sense it is
> conceptually related to the first element of a
> securities fraud claim——whether the defendant
> made a misstatement or an omission——not to the
> third element——whether the defendant acted
> with scienter. Nevertheless, the term "group
> pleading" is useful in describing the practice
> of improperly attempting to attribute scienter

> to a group of persons without enlightening
> each defendant as to the person's particular
> part in the alleged fraud.

*Fener*, slip op. at 22 n.14 (citations and some quotation marks omitted).

As the court explains above, in deciding Perot's motion to dismiss, the court accepts the facts plaintiffs allege in their complaint as true and construes the allegations in the light most favorable to them. The court does not strain to find favorable inferences, and it does not accept conclusory allegations, unwarranted deductions, or legal conclusions.

Additionally, concerning the issue of scienter, "[w]hile under Rule 12(b)(6) all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable . . . . Rather, inferences of scienter survive a motion to dismiss only if they are both reasonable and strong inferences." *R2 Invs.*, 401 F.3d at 645 (internal quotation marks omitted). "[P]ursuant to the PSLRA, failure to adequately plead scienter requires dismissal of the complaint." *Fin. Acquisition Partners*, 440 F.3d at 287 (citing 15 U.S.C. § 78u-4(b)(3)(A)).

B

The court begins its assessment of plaintiffs' scienter allegations by addressing two matters. First, plaintiffs either do not intend to rely on a theory of conscious misbehavior (i.e., actual intent to deceive or defraud) to plead scienter, or they do

not adequately plead scienter on this basis. Although the complaint uses the term "conscious misbehavior" four times, in three instances the allegation relates primarily to Perot's alleged state of mind in making gaming proposals, not to misrepresentations in or omissions from SEC filings aimed at investors. *See* Compl. ¶ 118 ("[Perot] thereafter systematically engaged in the conscious misbehavior of making presentations in violation of these guidelines that [Perot] had promised the ISO it would follow."); *id.* ¶ 125 ("[Perot's] continued unethical marketing in violation of its promise to change . . . is indicative of conscious misbehavior."); *id.* ¶ 126 (alleging that marketing proposals to third parties that were contrary to ISO's interest, had failed to close loopholes in ISO protocols, and were based on non-public information were "indicative of conscious misbehavior"). In ¶ 129 plaintiffs assert that

> [Perot's] conscious misbehavior in making the highly unreasonable omissions alleged herein was intentional or severely reckless . . . [in that Perot] (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact alleged in par. 9 and omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock . . . .

*Id.* at 129. This allegation is deficient, however, because it is conclusory to the extent it is addressed to Perot's conscious conduct toward investors.

The closest the complaint comes to alleging facts that show intent to defraud is in asserting that Perot Chairman H. Ross Perot, Sr. ("Perot, Sr.") and others had a motive and opportunity to defraud.   As noted, although "[a]ppropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter," *Nathenson*, 267 F.3d at 412, "allegations of motive and opportunity, without more, will *not* fulfill the pleading requirements of the PSLRA," *Goldstein*, 340 F.3d at 246 (citing *Nathenson*, 267 F.3d at 412).   Plaintiffs have not otherwise adequately pleaded allegations of motive and opportunity that meaningfully enhance the strength of the inference of scienter.[14]

_____

[14]In ¶ 95 of the complaint, plaintiffs allege that Perot, Sr., H. Ross Perot, Jr. ("Perot, Jr."), and Nash

> had substantial motives to fail to disclose the material facts alleged in par. 9:  the Company was raising money from the public; and they were selling stock to the public.   The disclosure of the adverse material facts would hurt the Company's perception in the market, and such facts would hurt the Company's growth prospects.

Compl. ¶ 95.   They also aver that, "beginning in March 2000, [Perot] planned to use its shares as currency to acquire other companies and filed a Registration Statement therefor."   *Id.*   In ¶ 96 they allege that on March 30, 2000 Perot acquired Solutions Consulting, Inc. for cash and stock and on July 26, 2001 acquired substantially all the assets of Advanced Receivables Strategy, Inc. for cash and additional cash or stock payments.

In plaintiffs' May 12, 2005 statement clarifying certain insider selling allegations, *see supra* note 7, they have deleted all allegations in ¶ 95 of insider selling by Perot, Sr. and Perot, Jr.   This leaves only the allegations that Nash and Perot were attempting to raise capital and sell stock, were motivated to

Moreover, Perot cannot have acted with intent to defraud
unless at least one corporate official who made or issued an SEC
filing, or ordered or approved it or its making or issuance, or
furnished information or language for inclusion therein, or the
like acted with such an intent.  *See Southland*, 365 F.3d at 366
("[W]e believe it appropriate to look to the state of mind of the
*individual* corporate official or officials who make or issue the

_____

protect the company's perception in the market, and were protecting
its growth prospects.  As the court concluded in *Milano I*, these
allegations are insufficient to plead scienter.

> Plaintiffs' motive and opportunity allegations
> are insufficient to rectify the defects that
> the court identifies in this memorandum
> opinion and to create a strong inference of
> scienter.  They allege that Perot had a motive
> to commit securities fraud because (1) it was
> raising money from the public through its IPO,
> (2) the adverse material facts would hurt
> Perot's perception in the market, (3) the
> facts would hurt the company's growth
> prospects, and (4) Perot planned to use its
> shares as currency to acquire other companies.
> *See* Compl. ¶ 92.  Implicit in the final
> allegation is that Perot desired to maximize
> the price of its shares. These allegations of
> motive are germane to any publicly-owned,
> for-profit business and are therefore too weak
> to convert any inference created by plaintiffs
> into a strong inference of scienter.

*Milano I*, 2004 WL 2360031, at *9 n.10 (citing *Mortensen*, 123
F.Supp.2d at 1023-24); *see also In re Capstead Mortgage Corp. Sec.
Litig.*, 258 F.Supp.2d 533, 564 (N.D. Tex. 2003) (Lindsay, J.)
("Even before *Nathenson*, the Fifth Circuit made it clear that a
motive to raise capital, . . . and the desire to sell stock at
inflated prices, are all insufficient to support an inference of
scienter.").

statement (or order or approve it or its making or issuance, or who
furnish information or language for inclusion therein, or the like)
rather than generally to the collective knowledge of all the
corporation's officers and employees acquired in the course of
their employment." (emphasis added)).  The complaint fails to tie
any allegations of actual intent to defraud to such an individual.

Second, many of the allegations in the complaint suffer from
group pleading and must be disregarded on this basis.  Of the four
paragraphs cited above, three refer generally to Perot as a company
and one refers to "Defendant[ ]," i.e., Perot.  The complaint's
assertions concerning recklessness or severe recklessness likewise
are addressed to Perot as a corporation or to the defendant, i.e.,
Perot.  *See* Compl. ¶¶ 105, 106, 131, 135.  Because in determining
whether plaintiffs have adequately pleaded scienter the court must
examine the state of mind of the individual corporate official or
officials who made or issued SEC filing, or ordered or approved it
or its making or issuance, or furnished information or language for
inclusion therein, or the like, this improper use of group pleading
masks an inability to plead a strong inference of scienter and
ultimately contributes to the court's conclusion that the complaint
must be dismissed.[15]

_____

[15]Although the following observation is not controlling because
the court must assess the facts that are pleaded rather than focus
on the labels that are used, it is notable that this securities
fraud complaint is rather unique in that the word "scienter"
appears only once in 70 pages and 145 paragraphs.  In ¶ 107

C

Plaintiffs posit that Perot acted with scienter through six different individuals.  The court will recount plaintiffs' allegations concerning each of them and then assess the scienter allegations *in toto*.

1

The complaint alleges that Perot acted with scienter through its Chairman, Perot, Sr., who signed the Registration Statement and the Forms 10-K for 1999 through 2002.  Plaintiffs contend that Perot, Sr. knew about and participated in the California energy market sales effort and set corporate and marketing strategy that included the unethical and illegal conduct about which ISO complained.  They allege that in a June 6, 2002 conference call among Perot personnel and stock market analysts, Perot, Sr. stated:

_____

plaintiffs allege:

> Based on the foregoing, [Perot], per Ed Smith,
> Ron Nash, and others, acted with scienter in
> that the Company had easy access to or knew
> material facts that there was a legal duty to
> disclose and that rendered misleading an
> extremely important theme of the Company's
> disclosures, *i.e.*, "strong character".

For reasons the court will explain below, this allegation,
considered alone or together with other averments of severe
reckless and motive, is insufficient to plead a strong inference of
scienter.

- 29 -

>The [Perot] team members during this process
>[of working with ISO and the California Power
>exchange] came up with the creative idea, to
>streamline and facilitate the option process
>in terms of trading electricity.  CAL ISO, the
>Independent Systems Operator[,] reviewed this
>and agreed in writing that this would not be a
>conflict.  *Me and our team*, our sales team
>went out and made presentations to several
>prospective customers.  (Indiscernible) [W]e
>did not get a lot of entries, so we cease[d]
>the marketing effort.

*Id.* at ¶ 113 (first alteration in original) (emphasis omitted).[16]

Plaintiffs maintain that "[t]his alone is enough to plead scienter."  Ps. Br. 24.

The complaint also alleges that Perot, Sr. promoted a business strategy whereby Perot would "leverage and market its knowledge gained on one consulting assignment to obtain consultancy assignments from other companies relating to the same subject matter," even though "this fundamental business practice was pregnant with the possibility that inside or confidential information would be utilized."  Compl. ¶ 109.  Additionally, plaintiffs maintain that Perot, Sr. knew of ISO's charges of breach of contract.  The complaint avers that, according to an unnamed

---

[16]Perot disputes the accuracy of the transcript quoted in the complaint and posits that plaintiffs cannot rely on it because they have not identified the transcript with the particularity required by Rule 9(b) and the PSLRA and because the transcript is unreliable and constitutes hearsay.  The court need not address the accuracy of the transcript or plaintiffs' reliance on it.  Even assuming *arguendo* that the transcript is an accurate representation of Perot, Sr.'s statement, and that plaintiffs properly rely on it, Perot, Sr.'s conduct does not raise a strong inference of scienter.

former employee, Perot's standard practice at the time of ISO's charge of breach of contract was that such an allegation was to be reported by the appropriate account manager to Peter Altabef ("Altabef"), Perot's Vice President, General Counsel, and Secretary, and that he was to inform the "highest levels of the company." *Id.* at ¶ 112(c). The complaint also recounts the former employee's description of Perot, Sr.'s detail-oriented management style:

> [Perot] acted very much like the Army, in a top-down fashion in which directions were given from the top and information flowed back to the top . . . . [T]here was nothing important that the General Counsel and other[ ] responsible officials knew that they did not report to H. Ross Perot, Sr. or H. Ross Perot, Jr.

*Id.* at ¶ 112(d).  Plaintiffs do not specifically allege that any current or former employee has personal knowledge that Perot, Sr. was informed of ISO's charge; rather, they assert that it is "'very, very hard to believe' or 'inconceivable'" that Perot, Sr. had not been told of the charge.  *Compare id.* at ¶ 112(b) *with id.* at ¶ 114.

In sum, plaintiffs' allegations that Perot, Sr. acted with scienter hinge on his knowledge of the marketing proposals, the use of non-public information, and ISO's 1997 charges of breach of contract and breach of ethics.

2

The complaint alleges that Perot acted with scienter through H. Ross Perot, Jr. ("Perot, Jr."), an Executive Director and controlling shareholder at the time of the IPO, who since September 2000 has served as President and Chief Executive Officer.  Perot, Jr. was also a signatory to the Registration Statement and the Forms 10-K for 1999 through 2002.

Plaintiffs' allegations that Perot, Jr. acted with scienter are based on "substantially the same reasons as those enumerated for Perot, Sr.," Ps. Br. 26, with two additional allegations. First, the complaint alleges that "Perot, Jr. was very familiar with [Perot's] other California energy business and marketing, and was, in fact, in charge and 'took care of everything' in [Perot's] business with the California Power Exchange."  Compl. ¶ 122(a). Second, plaintiffs aver that "Perot, Jr. employed the little-used phrase 'game the system' to explain what [Perot] did *not* do," *id.* ¶ 123 (bold font replaced by italics), thereby demonstrating his knowledge of the gaming proposals.

Thus just as with Perot, Sr., plaintiffs' allegations of Perot, Jr.'s scienter are based on his knowledge of the marketing proposals, the use of non-public information, and ISO's charges.

3

The complaint also alleges that Perot Vice President and Chief Financial Officer ("CFO") Terry Ashwill ("Ashwill") acted with

scienter.  Ashwill signed the Registration Statement and the Forms 10-K for 1999 and 2000.

Plaintiffs posit that Ashwill acted with scienter because as CFO he was responsible for preparing and reviewing the accuracy, validity, and completeness of Perot's SEC filings.  Furthermore, he either knew or was severely reckless in not knowing of Perot's illicit activities "given the significant marketing and 'profit margin' consequences for [Perot] of any end or even threat to the corporate strategy of sharing information of customers by the ISO." Ps. Br. 28.  Plaintiffs also contend that Ashwill knew of ISO's charges because as CFO he was regularly informed of problem contracts and related legal issues.  Finally, the complaint alleges that "it was standard practice for . . . finance (or 'accounting') to review marketing presentations[,] especially those related to the California Energy Market."  Compl. ¶ 116.  All these allegations, if pleaded with sufficient particularity, pertain only to Ashwill's knowledge of the marketing presentations and ISO's charges.

4

The complaint avers that Perot acted with scienter through Vice Presidents Smith and Nash.  Although Smith and Nash did not sign any SEC filings, plaintiffs nonetheless maintain that, as heads of Perot's Energy Department, they were responsible for the fraudulent omissions because each one "furnished or should have

furnished the information" about the Energy Department's business and ethics, "which served as the basi[ ]s for [Perot's] statements insofar as they related to the [E]nergy [D]epartment." *Id.* at ¶ 100.

In plaintiffs' amended complaint, their allegations of scienter that were sufficient to satisfy the particularity requirements of Rule 9(b) rested on the actions of Smith and Nash alone.[17]  In *Milano I* the court held that plaintiffs had failed to plead facts that showed that Smith or Nash was responsible for the statements in the public filings alleged to be misleading, because the complaint specified no facts that supported the conclusion that either one made or issued a statement, ordered or approved it or its making or issuance, or furnished information or language for inclusion in any of the company filings alleged to have been misleading.  *Milano I*, 2004 WL 2360031, at *10.

Plaintiffs contend they have addressed the defects that the court identified in *Milano I*.  They maintain that this shortcoming

---

[17]As the court explained in *Milano I*:

> Plaintiffs allege that Perot, "per Ed Smith, Ron Nash, *and others,* acted with scienter[.]" Compl. ¶ 99 (emphasis added). The court will disregard the part of this assertion that relates to unnamed "others" because it is insufficient to satisfy the particularity requirements of Rule 9(b).

*Milano I*, 2004 WL 2360031, at *10 n.11 (citing *Southland*, 365 F.3d at 362).

is alleviated because the complaint pleads that (1) Perot, Sr. regularly attended sales meetings; (2) Perot, Sr., Perot, Jr., and Ashwill—each of whom signed the SEC filings—were informed through counsel of breaches or potential breaches of contracts with clients as well as investigations by regulators and others; (3) Nash, as a Perot shareholder, regularly received and read the SEC filings at issue and had a duty to correct them; and (4) Perot consulted heads of divisions (including Smith and Nash), the Legal Department, and Perot, Sr. and Perot, Jr. concerning disclosures in the SEC filings.

5

Finally, the complaint alleges that Perot acted with scienter through Altabef, Perot's Vice President, General Counsel, and Secretary. Plaintiffs contend that "[i]t is axiomatic that as General Counsel, Altabef knew of the charges from the ISO and marketing practices of [Perot]." Ps. Br. 27. They also maintain that Altabef knew of ISO's charges because it was standard practice at Perot for the General Counsel to be informed of a client's allegation of breach of contract. Additionally, plaintiffs aver that Altabef was copied on correspondence related to ISO's charges of breach of contract.

D

The court must consider all the facts and circumstances alleged to determine whether they *in toto* raise a requisite strong inference of scienter, and it must consider cumulatively any evidence of scienter that plaintiffs have pleaded.

Viewed in the aggregate, the complaint identifies six individuals who purportedly knew or were severely reckless in not knowing of Perot's gaming proposals, its use of non-public ISO information, ISO's allegations of breach of contract and of ethics, Perot's continuation of its line of business proposing unlawful gaming transactions based on non-public information after telling ISO it would change its sales presentations and behave ethically, and its conduct that exposed it to material risks of losing or impairing its critical strong character perception and to other types of risks. Plaintiffs posit that because these persons knew of the allegedly omitted facts specified in ¶ 9 of the complaint, or were severely reckless in not knowing of them, they acted with scienter in not disclosing the facts in Perot's SEC filings or providing the relevant information to be included in the filings.

*Southland* teaches that, to determine whether a statement made by a corporation such as Perot was made with scienter, it is appropriate to look to the state of mind of the individual corporate official or officials who made or issued the statement, or ordered or approved it or its making or issuance, or furnished

information or language for inclusion therein, or the like, rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment. *Southland*, 365 F.3d at 366.   This principle applies with equal force to omissions.   As the court has pointed out above, however, the complaint suffers throughout from impermissible group pleading that prevents the court from identifying in many (if not most) instances who the particular person is who had actual knowledge, or due to severe recklessness should have had knowledge, and thus acted with scienter that is attributable to Perot as a corporate defendant.

Additionally, even assuming that plaintiffs have adequately pleaded that such a person had actual knowledge of a particular fact and did not disclose it, this of itself is insufficient to raise a strong inference of scienter.   Persons who sign, approve, or furnish information for SEC filings are often privy to myriad information that need not be released to the investing public.   In fact, if marginally relevant information were disclosed in large volumes, it might prove counterproductive by drowning out the disclosures that should catch the attention of investors and the investment community.   Such persons do not therefore necessarily act with severe recklessness by failing to disclose all information of which they are aware.   *See Chiarella v. United States*, 445 U.S. 222, 234-35 (1980) (holding that § 10(b) fraud does not arise from

the mere possession and non-disclosure of non-public market information). Under the severe recklessness standard for inferring intent to defraud, the omission of information is not actionable unless the individual also has actual knowledge of a *danger of misleading investors*, or the danger is so obvious that the individual must have been aware of it. *See, e.g., Nathenson*, 267 F.3d at 408.

Thus in order for the complaint adequately to plead that one of the six individuals in question acted with scienter based on severe recklessness, it must allege specific facts that show not only that the individual knew of one or more facts alleged in ¶ 9 of the complaint, but also that not disclosing them was a highly unreasonable omission. Such conduct must have involved not merely simple or even inexcusable negligence but an extreme departure from the standards of ordinary care that presented a danger of misleading buyers or sellers that the individual either knew about or that was so obvious that he must have been aware of it. This standard is much more stringent than the one plaintiffs propose, and they have failed to meet it.

The complaint does not explain how any such individual acted with severe recklessness. Plaintiffs' allegations rest solely on an individual's knowledge of the facts that are set out in ¶ 9. The complaint does not explain why it would have been an extreme departure from the standards of ordinary care for any *individual*

who signed, ordered, furnished information for, or otherwise had
some responsibility for the SEC filings to conclude that the ¶ 9
allegations needed to be disclosed to prevent investors from being
deceived.  Rather, it asserts amorphously that *Perot* acted with
severe recklessness.  *E.g.*, Compl. ¶ 131 ("The Company's material
omissions were made knowingly or recklessly . . . .").  The
complaint thus does not sufficiently allege that Perot acted with
scienter through the severe recklessness of any responsible
individual.

Moreover, even attributing the accumulation of all the
scienter allegations to one individual, plaintiffs have not pleaded
facts that give rise to a strong inference of scienter.  The court
will assume that a responsible person (i.e., a signatory, furnisher
of information, or other person responsible for an SEC filing)[18]
knew about Perot's gaming proposals, its use of non-public ISO
information, and ISO's allegations of breach of contract and of
ethics.  According to the complaint, ISO complained of Perot's
breach of contract and breach of ethics in a telephone conversation
on October 21, 1997 and a letter dated October 22, 1997.  ISO
demanded that Perot promptly cease the marketing proposals.  Nash,

---

[18]When the court hereafter uses the shorthand term "responsible
person," it means someone who falls within one or more of the
categories identified in *Southland*: "the individual corporate
official or officials who make or issue the statement (or order or
approve it or its making or issuance, or who furnish information or
language for inclusion therein, or the like)." *Southland*, 365 F.3d
at 366.

on behalf of Perot, "aggressively responded to the ISO that [Perot] supposedly had not utilized the information it developed in the ISO consulting for its sales presentations; and [Perot] requested a retraction of the ISO's breach of ethics and breach of contract charges."  Compl. ¶ 70(b).[19]  Nevertheless, in late 1997 and early

_____

[19]Plaintiffs apparently allege that Perot later admitted it had used confidential ISO information in the marketing proposals:

> Only later, when [Perot] had to produce documents pursuant to subpoena, was [Perot] forced to admit that it had breached its contract with ISO by divulging confidential information.  Specifically, contrary to Perot[ ] Company's aggressive assertions to the ISO in 1997 (and contrary to Mr. Perot, Sr.'s glib assurances to the market in June 2002) that [Perot] had not breached its contract nor divulged confidential information, [Perot] admitted in a statement to the market on December 4, 2002 as follows.
> > . . . the company has discovered that in late 1997, before the deregulated market opened, a [Perot] employee who worked on the . . . [ISO] account inappropriately disclosed a limited number of ISO documents to a third party consultant with whom he had a personal relationship . . . . [Perot] notified the ISO and the California Power Exchange, the account to which the employee was most recently assigned, of its discovery of incident and has taken appropriate personnel action.

Compl. ¶ 71 (sixth alteration and ellipses in original).

    On its face, Perot's "admission" is unrelated to the use of confidential ISO information in its marketing proposals.  The statement relates only to an inappropriate disclosure to an individual with whom the Perot employee had a personal

- 40 -

1998, Perot added a slide to its marketing presentations stating that its services were not based on knowledge of any proprietary client systems.  And Perot worked with outside counsel to erect an "ethics wall" to prevent the improper disclosure of confidential client information.[20]

Even assuming that a responsible person knew about the gaming proposals, the use of non-public information, and ISO's charges, plaintiffs have not pleaded sufficient facts to support the conclusion that it was severely reckless for that person not to disclose this information in Perot's IPO Registration Statement. At the time Perot issued its Registration Statement on February 1, 1999, over one year had elapsed since ISO's complaint.  During this period, Perot had aggressively denied the charges and implemented steps to ensure they did not arise again, and nothing more came of the allegations.  Plaintiffs have failed to plead facts that, viewed favorably, show that it was an extreme departure from the

_____

relationship, not to a California energy provider.  Plaintiffs' proffered inference that this in any way relates to the marketing proposals is unreasonable and is not accepted by the court.

[20]According to the complaint,

> after [Perot] conceded to [ISO] that the Company would change its sales presentations, the Company's in-house attorneys then worked with ISO's outside counsel . . . during late 1997 and early 1998 to develop an "ethics wall" and other mechanisms to prevent the improper disclosure of nonpublic information.

Compl. ¶ 76.

- 41 -

standards of ordinary care for any individual to conclude that the issue had been resolved in the intervening year and that there was no need to disclose the information in the Registration Statement.

Plaintiffs also allege that Perot continued to act unethically with regard to ISO by persisting in its use of non-public ISO information to market gaming proposals. Accepting this assertion as true and assuming that a responsible person knew about it, the complaint still fails adequately to plead that the decision not to disclose the information in the Forms 10-K for 1999 through 2002 amounts to severe recklessness. Plaintiffs aver that Perot's marketing proposals continued until as late as 2000, approximately three years after ISO's complaint, and that during this period Perot employees presented gaming proposals to as many as 10 additional potential customers in the California energy market.[21] Yet the complaint does not allege that ISO ever reasserted its claims of breach of contract or of ethics, sued or threatened to sue, stopped or threatened to stop performing under its contract with Perot (if the agreement was still in effect), or even suggested that Perot's actions were in any way improper. Nor do plaintiffs aver that the reason ISO did not take any of these steps was that it was unaware of Perot's continued activities. In this

---

[21]Most of these allegations are conclusory and are pleaded with no specificity at all. *E.g.*, Compl. ¶ 64(g) (after describing with some detail a presentation made to SCE, alleging that "presentations similar to that made to [SCE] were made during 2000 by [Perot] to Dynergy, Duke and Reliant").

context, plaintiffs have failed to plead sufficiently that it was severely reckless for any responsible individual to conclude at the time each Form 10-K was issued that all ethical or character issues with ISO had been satisfactorily resolved and that there was no danger of misleading investors by not disclosing that it continued to market gaming proposals in the California energy market.

The fact that the complaint fails to plead that ISO continued to complain about Perot's conduct is significant.  Although plaintiffs aver that for several years Perot proposed games to utilities, energy traders, and other companies, the heart of their lawsuits is rooted in ISO's relationship with Perot, as the consultant who developed protocols and systems to create California's system for pricing, trading, and supplying energy.  It is the nature of that relationship that effectively defines whether Perot breached the consulting contract or acted unethically by using non-public information to teach clients how to game the system.  If any entity had reason to complain about Perot's activities from 1997 through 2000, it was ISO.  It was ISO who was Perot's client, it was ISO's system that Perot was allegedly teaching clients to game, and it was ISO's non-public information that Perot allegedly used for its own gain.  If ISO was no longer challenging Perot's conduct, if it considered the 1997 controversy resolved, or if, for example, it deemed the ethics wall to be adequate, a Perot officer or person responsible for providing

information for an SEC filing would not have acted with severe recklessness by deciding not to disclose in SEC filings that Perot was continuing to teach games. The complaint does not address these circumstances and, in failing to do so, it fails to plead specific facts that show severe recklessness and, in turn, scienter.

Plaintiffs have also failed to plead facts giving rise to a strong inference that it was severely reckless for an individual not to disclose that Perot's conduct exposed it to various risks. The complaint specifically alleges three risks that Perot should have disclosed: (1) the risk of losing or impairing its critical "'strong character' perception," (2) the risk of incurring civil liability and loss, and (3) the risk of "higher legal expenses for federal or state legislative regulatory and/or criminal investigations." Compl. ¶ 9(e)(1)-(3). But the only adequately-pleaded accusation concerns a breach of ethics. This matter appeared to have been resolved in 1998. So plaintiffs have not sufficiently alleged that in 1999 through 2002 it was an extreme departure from the standards of ordinary care for a responsible person to conclude that Perot did not face material risks resulting from ethical problems. Nor was it severely reckless for the person to think that Perot did not face material civil liability, since ISO had never sued or threatened to sue. And plaintiffs have failed to plead facts that demonstrate that a responsible person

should have anticipated any governmental investigation based on its activities in the California market. Plaintiffs' allegations fall far short of a strong inference of scienter.

The lack of severe recklessness is even more evident given the broad, general nature of the statements Perot made regarding the character of its employees. Perot merely claimed that it sought to hire and retain employees with, among other traits, "strong character." As noted, severe recklessness is limited to misrepresentations that present a danger of misleading buyers or sellers that is either known or is so obvious that a person must have been aware of it. *See Nathenson*, 267 F.3d at 408. Plaintiffs have not adequately pleaded how it would have been unreasonable for someone to conclude that the investing public would rely on objective facts rather than on these general statements when making an investment decision. The court has already held that these general statements do not constitute material misrepresentations——i.e., they would not have altered the total mix of information available to a reasonable investor. *See supra* at § III(D)(2). The court's conclusion confirms that plaintiffs have failed adequately to plead that Perot acted with severe recklessness in deciding that omitting the facts posed no danger of misleading the investing public.

When the court disregards improper group pleading and conclusory allegations, plaintiffs have failed to plead facts that

give rise to a strong inference of scienter, and the § 10(b)/Rule 10b-5 claim must be dismissed on this ground as well.

V

Plaintiffs maintain that Perot is liable under § 10(b) and Rule 10b-5 because it failed to disclose information, in violation of various SEC Rules and Regulations.   Specifically, plaintiffs assert that Perot's omission of the facts alleged in ¶ 9 of the complaint violated Regulation S-K, Items 101 and 503, 17 C.F.R. §§ 229.101, .503 (2005), and SEC Rule 12b-20, *id.* § 240.12b-20 (2005).

A

Section 10(b) imposes liability for the use of a "manipulative or deceptive device or contrivance in contravention of" the SEC's Rules and Regulations.   15 U.S.C. § 78j(b).   Under Rule 10b-5 a plaintiff can assert a private right of action for material misstatements or omissions.   Section 10(b) and Rule 10b-5 both require that the defendant have acted with scienter.   Accordingly, the PSLRA's heightened pleading standard applies to complaints alleging a § 10(b)/Rule 10b-5 claim, regardless which SEC Rule or Regulation the claim is based on.

B

Plaintiffs aver that Perot violated Item 101(a)(1) by failing to disclose a "material change[ ] in the mode of conducting the business."   17 C.F.R. § 229.101(a)(1).   The complaint alleges that

- 46 -

Perot violated Item 101(a)(1) "by failing to disclose that it had changed its mode of conducting business in respect of proposing unlawful transactions, and doing so in [an] unethical course [or] manner that included misusing information gained in its consulting engagements."   Compl. ¶ 91(b); *see also id.* ¶¶ 99, 104 (incorporating ¶ 91(b)'s allegations into § 10(b) claim).

The complaint does not adequately plead that Perot's gaming proposals were so pervasive a component of its consulting business that it constituted a material change in the mode of conducting the business.  Even if Perot acted unlawfully and unethically (which as the court explains *supra* at § IV(D) is not altogether clear based on plaintiffs' failure to plead any ISO complaints after 1997), plaintiffs do not allege sufficient facts to show what percentage of Perot's consulting business was composed of such activities. Without such detail, it cannot be determined whether any change in the mode of conducting the business——i.e., from doing so ethically to doing so unethically——was so widespread as to be a material change.  For example, a company's limited violation of the law, or its narrow participation in unethical behavior, by a handful of employees in one market may not of itself indicate that the unlawful and unethical behavior has become so commonplace as to represent a material change in how it does business.  Although such behavior arguably would amount to a material change if Perot had an entire line of business conducted via unlawful or unethical

behavior, as the court explains below, plaintiffs have inadequately pleaded this.   Because the complaint lacks necessary detail concerning how Perot's alleged conduct in the California energy market during  the period in question bore upon the corporation's activities as a whole, they have failed to plead adequately that Perot violated Item 101(a)(1).

Alternatively, even if Perot should have made this disclosure, the complaint does not allege facts that give rise to a strong inference that a responsible person acted with scienter.  They have not pleaded specific facts that support the determination that it was severely reckless for such a person to conclude that the unsuccessful marketing proposals did not constitute a material change in the mode of conducting its business.  That is, they have not alleged sufficient facts to show that, if not revealed, the omitted information presented a danger of misleading buyers or sellers that was either known to a responsible person at Perot or so obvious that the person must have been aware of it.

C

Plaintiffs also allege a violation of Item 101(c)(1), which required Perot to "[d]escribe the business done and intended to be done . . . , focusing upon [its] dominant segment or each reportable segment about which financial information is presented in the financial statements."  17 C.F.R. § 229.101(c)(1).  The complaint alleges that Perot violated Item 101(c)(1) "by failing to

disclose that it had a line of business or a portion of a line of business in which [Perot] proposed unlawful 'gaming' transactions to energy and utility companies." Compl. ¶ 91(c); *see also id.* ¶¶ 99, 104 (incorporating ¶ 91(c)'s allegations into § 10(b) claim).

Plaintiffs have failed to plead with sufficient particularity that Perot's gaming proposals in fact constituted a "line of business." Their characterization that Perot had such a "line of business" is conclusory, and the court does not accept it unless the complaint pleads facts that would reasonably give rise to this inference. *See Southland*, 365 F.3d at 361 ("Nor [does the court] accept conclusory allegations, unwarranted deductions or legal conclusions.").

The complaint purports to plead that Perot had such a "line of business" by alleging certain "examples" of gaming presentations that occurred during a three-year period. *See* Compl. ¶¶ 52-64. But the examples given represent no more than a limited number of instances of gaming presentations made by a handful of Perot employees and an outside consultant. The premise that Perot intended this to be a "line of business" is also undercut by other allegations in the complaint, including that Perot sought during late 1997 and early 1998 to develop an "ethics wall" and other mechanisms to prevent the improper disclosure of non-public information. *See id.* at ¶ 76. This would tend to show that Perot

*did not* intend to use non-public information in marketing its consulting business.

Moreover, because plaintiffs do not have personal knowledge of Perot's lines of business, their allegation that the proposals constituted a line of business or a portion thereof is necessarily based on information and belief. *See ABC Arbitrage*, 291 F.3d at 351 (holding that allegations "not based upon [p]laintiffs' personal knowledge . . . are . . . necessarily pleaded on 'information and belief,' [even if] not labeled as such."). The PSLRA requires that allegations based on information and belief be pleaded with particularity. *See* 15 U.S.C. § 78u-4(b)(1); *ABC Arbitrage*, 291 F.3d at 350.

Plaintiffs have failed to plead facts that demonstrate that the marketing proposals constituted a line of business. For example, the complaint does not allege that Perot expected the marketing proposals to generate revenue that would be substantial in relation to Perot's other lines of business. Nor does it aver that Perot invested a significant amount of money in the marketing proposals. At most, the complaint asserts that the marketing proposals were a part (and perhaps no more than a small part) of Perot's consulting business. The complaint neither supports the proposition that the marketing proposals were a "dominant segment" of Perot's business, nor does it allege facts that show that it was a "reportable segment" about which Perot presented financial

information in its financial statements.  Item 101(c)(1) thus did not require Perot to disclose the gaming proposals.[22]

D

Plaintiffs also allege that Perot violated Item 503(c), which required Perot "[w]here appropriate, [to] provide . . . a discussion of the most significant factors that make the offering speculative or risky."  17 C.F.R. § 229.503(c).

Plaintiffs have failed to plead facts that give rise to a strong inference that Perot acted with scienter in omitting the facts alleged in ¶ 9 of the complaint.  At the time the Registration Statement was issued, it would not have been unreasonable for Perot to conclude that its marketing proposals did not pose any of the "most significant factors" making Perot's IPO risky.  By the time the Registration Statement was issued in 1999, nothing had come of ISO's charges of breach of contract and of ethics or of complaints made by other customers to whom Perot proposed gaming transactions.  During the interval of more than one year between ISO's charges and issuance of the Registration Statement, ISO had neither filed a lawsuit nor threatened to cancel its contract nor further pursued its allegations in any meaningful way.  Other utilities to whom Perot had made presentations in 1997

---

[22]Moreover, plaintiffs have not pleaded facts that give rise to a strong inference that Perot acted with scienter when it opted not to disclose the gaming proposals in accordance with Item 101(c)(1).

and 1998 likewise are not alleged to have pursued complaints. Perot had also attempted to erect an ethics wall to prevent the disclosure of confidential client information, thereby limiting the risk of Perot's exposure to liability for disclosing non-public information.  Plaintiffs have failed to plead specific facts that support the conclusion that the gaming proposals posed a significant risk to Perot's business.  Nor have they adequately alleged that Perot acted with scienter in that it was severely reckless for a responsible person to decide either that the gaming proposals never posed or no longer posed a significant risk at the time of SEC filing in question.

E

Finally, plaintiffs allege that Perot violated SEC Rule 12b-20, 17 C.F.R. § 240.12b-20, which provides: "In addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading." *Id.*  The complaint alleges that Perot "violated Rule 12b-20 by failing to disclose the negative material facts alleged at par. 9." Compl. ¶ 91(d).  It does not, however, identify any required statement in Perot's SEC filings that was rendered misleading by its failure to disclose the facts alleged in ¶ 9.  It instead alleges that the omission of the ¶ 9 facts rendered

misleading Perot's statements about its employees' character. But as the court explains *supra* at § III(D)(2), the omission of these facts did not render Perot's "strong character" statements materially misleading. Even if they did, Rule 12b-20 on its face addresses only "required statements," 17 C.F.R. § 240.12b-20, and plaintiffs have not asserted that Perot was *required* to speak about its employees' character. Thus Rule 12b-20 is not a basis for Perot's liability under § 10(b) and Rule 10b-5.

F

As the court explains above at note 13, the court's reasoning in §§ III and V results in dismissal of plaintiffs' actions without reaching the issue of scienter. Accordingly, on these grounds alone, these lawsuits must be dismissed.

VI

Because the court is granting Perot's motion to dismiss, it must address plaintiffs' request for leave to amend. The determination whether to grant leave to replead is a matter within this court's discretion. *See, e.g., ABC Arbitrage*, 291 F.3d at 362. The court has already afforded plaintiffs one opportunity to rectify the defects in their complaint. In *Milano I*, although the court dismissed plaintiffs' § 10(b)/Rule 10b-5 cause of action, it permitted plaintiffs to replead, in part because it is this court's practice to allow plaintiffs at least one opportunity to replead after the court has identified defects in a complaint to which the

PSLRA applies, and in part because it dismissed the claim based on reasoning that Perot did not precisely raise. *See Milano I*, 2004 WL 2360031, at *11 n.18.  This is not the case this time, however, because plaintiffs have already had a fair opportunity to replead and the court's reasoning is based on grounds that Perot presents in its motion to dismiss.  Despite multiple opportunities to plead sufficient facts that give rise to a strong inference of scienter, they have not done so.  Plaintiffs have offered no persuasive reason to conclude that, if afforded still another opportunity to amend, a revised complaint would yield a different outcome.  The court in its discretion therefore denies their request for leave to replead yet again. *See ABC Arbitrage*, 291 F.3d at 362 (concluding that district court did not abuse its discretion by denying leave to replead where court had already given plaintiffs one opportunity to do so).

*        *        *

Defendants' February 25, 2005 motion for dismissal is granted. Defendants' June 29, 2005 second motion for dismissal is denied without prejudice as moot.  Defendants' June 29, 2005 request for

- 54 -

judicial notice is also denied without prejudice as moot.  The
court has filed a judgment of dismissal today.

**SO ORDERED.**

March 31, 2006.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE